UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| KELLY JOHNSON, on BEHALF of HIMSELF and ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC., a DELAWARE CORPORATION, and DOES 1 through 250, inclusive,<br><br>Defendants. | Case No.: SACV 07-00931-CJC(RNBx)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

**I.    INTRODUCTION**

Defendant Mitsubishi Digital Electronics America ("MDEA") moves for summary judgment on the claims alleged by Plaintiff Kelly Johnson for breach of express warranty,[1] fraudulent concealment, violation of California Business and

---

[1] Mr. Johnson has conceded that there is no privity between himself and MDEA, and, therefore, waives his opposition to MDEA's motion for summary judgment on his implied warranty claim. (Pl.'s Brf. at 24).

Professions Code § 17200, and unjust enrichment. Mr. Johnson's claims all arise from his $3103.99 purchase of an MDEA television set from the New Jersey electronics store Camera Stop on November 6, 2005. Mr. Johnson's purchase of the television was based primarily on a conversation with a salesman at Camera Stop. He asked the salesperson at Camera Stop to recommend the best "1080p" television set on the market, and the salesperson pointed Mr. Johnson to the MDEA television. His sole contact with MDEA consisted of one visit to the MDEA Web site to check the television's price and confirm that it was 1080p.

Mr. Johnson wanted to buy a state-of-the-art television and was apparently willing to spend more than $3,000 to get it. He knew that 1080p was the industry's marketing buzzword and allowed that to define his purchasing decision, despite not knowing what 1080p meant. Even after his involvement in a national lawsuit over television technology, Mr. Johnson still cannot explain whether 1080p refers to the resolution of a television screen, the signal coming into the television set, or the television's ability to process that signal. Nevertheless, Mr. Johnson now claims MDEA duped him into believing the television could receive a native 1080p signal from available and future sources.

When Mr. Johnson purchased the television, there were virtually no consumer devices that were capable of outputting a native 1080p signal. Then, as now, cable and broadcast television outlets did not transmit a 1080p signal. Were those signals available over the air, Mr. Johnson's television has the ability to receive them through its antenna. Mr. Johnson's television also possibly has the ability to receive native 1080p signals through an input port called an IEEE 1394, or Firewire, port. Unfortunately for Mr. Johnson and others who purchased that year's MDEA televisions, broadcast outlets have not supplied signals in 1080p. And the devices that do produce 1080p signals—such as Blu-ray disc players or advanced video gaming

consoles—do not use Firewire ports.  They plug into a different input port, called a High Definition Media Interface ("HDMI") port.  Mr. Johnson's television is unable to receive and display native 1080p signals from HDMI-compatible devices.  However, its internal computer chip can receive slightly lower-resolution signals through its HDMI input ports and upscale them to a 1080p resolution.

After carefully considering the undisputed evidence presented by the parties and the arguments of their counsel, the Court concludes that MDEA is entitled to summary judgment on Mr. Johnson's claims.  In 2005, Mr. Johnson went out in search of the best 1080p television on the market, without any inkling of what the term 1080p meant.  He went to Camera Stop.  He saw the MDEA television and liked the picture.  He purchased it, put it in his "man room," and used it to watch high-definition cable television programming, programming that has not been and is still not available as a native 1080p signal.  In 2007, Mr. Johnson filed this action against MDEA alleging the company fooled him into purchasing a television that was not as advanced as he believed it was.  But the Court is at a loss to understand how MDEA duped or hurt Mr. Johnson.  He still watches the television.  He has not articulated how its inability to accept the few available 1080p signals affects his enjoyment of the television.  Indeed, he stated his television is "great."  When asked, he could not point out a television he liked better, tacitly admitting that as far as he knew, he bought the best television on the market at the time.  Simply put, in 2005 he went looking for the best television, and now, almost three years later, it is clear that Mr. Johnson got exactly what he wanted.  Accordingly, MDEA's motion for summary judgment is GRANTED.

## II.   FACTUAL BACKGROUND

Mr. Johnson purchased a Mitsubishi WD-52627 television for $3103.99 on November 6, 2005 from the Camera Stop store in New Jersey.  (Compl. ¶¶ 31-36.)

1  MDEA has marketed the television model as a 1080p television set.  (Decl. of Alfredo
2  Torrijos Ex. 1 ("Release").)  MDEA constructed the set to display a video image on
3  1080 horizontal lines, displaying the image on all of the lines at once, or progressively.
4  (Decl. of Glen Yamashita ("Yamashita Decl.") ¶ 3.)   Video signals are produced in
5  several different resolutions, including three signals that are typically referred to as
6  high-definition signals: (1) 1080p, which is 1080 lines of resolution with a new image
7  transmitted on all lines at once, progressively scanned; (2) 1080i, which is 1080 lines
8  of resolution transmitted on alternating lines of a television, interlaced; and (3) 720p,
9  which is 720 lines of resolution, transmitted on all lines at once, progressively scanned.
10  Currently, cable, satellite, and broadcast companies most commonly supply 720p
11  signals.  (Decl. of Harlan Rogers ("Rogers Decl.") ¶ 6.) Certain video game, videodisc,
12  and personal computer systems are the major sources of video content that is
13  transmitted in 1080p.

15       The television set includes several input ports that are capable of receiving video
16  signals of varying quality.  The television includes two HDMI input ports.  HDMI
17  input ports are the electronics industry's standard type of input port for transferring
18  high-definition video signals from electronic devices, such as cable boxes, videodisc
19  players, and gaming consoles, to televisions for display.  The HDMI input ports on the
20  MDEA television set are incapable of receiving 1080p video signals, but are capable of
21  receiving 1080i signals and 720p signals. (Yamashita Decl. Ex. A, at 107.)  Once
22  received, a computer chip inside the television processes the signals from the HDMI
23  input ports, upscaling them to be displayed on all of the television's 1080 lines,
24  progressively scanned.  MDEA claims that two other inputs on the television, the IEEE
25  1394 input ports and the television's antenna, are capable of receiving 1080p video
26  signals.  (Yamashita Decl. ¶ 4.)  However, broadcasters do not transmit their signals in
27  1080p, and few, if any, devices use IEEE 1394 interfaces to send video content.
28  (Yamashita Decl. ¶¶ 5, 6.)  At the time the television was designed, there were no

native 1080p sources readily available to most consumers.  (Rogers Decl. ¶ 6.)  Mr. Johnson has provided no evidence that other televisions on the market at the time were able to receive 1080p video signals through their HDMI input ports.

As an avid Philadelphia Eagles fan in the midst of the team's post-Superbowl season, Mr. Johnson set out to purchase a new television with a singular goal: he wanted to buy the best 1080p television set on the market at the best price.  (Decl. of John Purcell Ex. A, Dep. of Kelly Johnson ("Johnson Transcript") at 38.)  Mr. Johnson had decided that he wanted a 1080p television set after watching unspecified advertisements from major electronics companies that convinced him that 1080p was the state of the art.  (*Id.*)  He made this decision despite the fact that he did not, and still does not, comprehend the definition of 1080p, other than defining it as the "best."  (Johnson Transcript at 119.)  Two factors influenced Mr. Johnson's decision to purchase the MDEA television set: (1) a visit to the MDEA Web site to check the television set's price and confirm it was 1080p; and (2) the recommendation of a sales person at Camera Stop in response to Mr. Johnson's query as to which television was the best 1080p television on the market.  (Johnson Transcript at 67; Torrijos Decl. Ex. 4, Deposition of Kelly Johnson ("Johnson Dep.") at 87.)  The Camera Stop salesman told Mr. Johnson that the Mitsubishi was the best 1080p set on the market.  (Johnson Transcript at 61.)  Furthermore, Mr. Johnson inspected the display model in the store and looked at the picture.  (*Id.* at 138.)  Apparently satisfied that the MDEA television was the one for him, Mr. Johnson purchased the television set from Camera Stop and contracted with the store to have it set up in his home.  He made the decision without exposure to MDEA's marketing or agents other than its Web site.  (Johnson Transcript at 77, Johnson Dep. at 87.)

After Camera Stop set up his television, Mr. Johnson was dismayed to find that Comcast, his cable operator, did not broadcast its video signals as 1080p signals.  In

fact, no cable company or broadcast outlet transmitted 1080p signals. (Rogers Decl. ¶ 6.) Although MDEA asserts that the television has the capability to receive 1080p signals through its antenna and one of its inputs, the television is incapable of receiving a 1080p signal through its HDMI input ports, the input ports used for the vast majority of video devices on the market. (*Id.* ¶ 8.) Despite feeling like MDEA duped him, Mr. Johnson also believed that his set was "a nice TV," or a "great TV," and knows of no better television on the market in 2005. (Johnson Transcript at 60, 65, 113.) Mr. Johnson did not attempt to return the television to Camera Stop nor did he contact MDEA to complain about his feelings of being deceived. (*Id.* at 60, 134.) Still, when he received an e-mail solicitation from an attorney searching for possible plaintiffs in a class action suit against MDEA for the marketing and sale of this television set, Mr. Johnson responded. (Johnson Dep. at 24.)

Subsequently, Mr. Johnson filed this lawsuit alleging that MDEA violated express warranties, committed fraudulent concealment, violated California Business and Professions Code § 17200, and was unjustly enriched because it sold Mr. Johnson a television promoted as 1080p that could not receive a 1080p signal through its HDMI input ports.

### III.   STANDARD OF REVIEW

Summary judgment is proper if the evidence before the court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a

situation, there can be "no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex*, 477 U.S. 322-23.

A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**IV.   ANALYSIS**

**A. EXPRESS WARRANTY**

Mr. Johnson alleges that MDEA breached express warrantees to him in two ways: (1) MDEA breached an express warranty for performance of the television's embedded software; and (2) MDEA breached a general express warranty created pursuant to California Commercial Code § 2313 by marketing the television as 1080p.

### 1) Embedded Software Warranty

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Group*, 505 U.S. 504, 525 (1992). MDEA warranted the television against defects in its embedded software:

> The limited warranty contained in this section shall continue for a period of one (1) year from the date of the original purchase at retail. If, after prompt notice within the warranty period, MDEA determines that the Embedded Software has failed to perform in accordance with such functional description in all material respects and if failure is not due to an accident, misuse, modification or misapplication of the Embedded Software, then MDEA shall modify or replace the nonconforming embedded software at no charge to you, which at MDEA's sole discretion may be fulfilled by means of modification or replacement software contained on a replacement memory card for customer installation. The foregoing shall be MDEA's sole obligation to you under this limited warranty.

(Pl.'s Brf. at 21.) Mr. Johnson claims that this warranty protects against any failure of the television to perform according to its functional description, regardless of the cause of that failure. (*Id.*) Because the television was allegedly incapable of processing 1080p signals through its HDMI input ports, and because MDEA described the television as 1080p, Mr. Johnson argues that MDEA breached its embedded software warranty.

Mr. Johnson's interpretation stretches the scope of this specific warranty language beyond reason. The language of the warranty clearly refers to the "embedded software" inside the television. Although Mr. Johnson alleges that the television's failure to accept a native 1080p signal is a breach of this warranty, it is clear from his allegations that his warranty claim is related to the manufacture and capabilities of the television's hardware, not its software. Further, it is uncontested

that changing or "fixing" the software, which is the only part of the television within the scope of this warranty, would not change the television's ability to receive native 1080p signals:

> [S]o-called 1080p televisions that do not accept a 1080p signals [sic] via HDMI cannot be upgraded to accept 1080p signals—that capability must be provided for in the initial design of the television or monitor circuitry and cannot be retrofitted.

(Compl. ¶ 22.) Software, the instructions that facilitate a computer's ability to carry out a task, is inherently upgradeable. Circuitry is the very hardware that runs the software. Thus, by Mr. Johnson's own admission, he has no claim related to the television's embedded software.[2]

### 2) Breach of Express Warranty under California Commercial Code § 2313

Mr. Johnson alleges that MDEA breached an express warranty created by California Commercial Code § 2313. That statute states:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain

---

[2] Mr. Johnson's embedded software warranty claim also fails because he failed to exercise his rights under the embedded software warranty within the time limit required by the warranty. In *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008), the Ninth Circuit held that a customer could not make an express warranty claim for defects in his car after the expiration of the warranty's three-year/36,000-mile limit. *See also Daugherty v. American Honda Motor Co.*, 144 Cal. App. 4th 824, (Cal. Ct. App. 2006) ("The general rule is that an express warranty does not cover repairs made after the applicable time or mileage periods have elapsed."). The embedded software warranty states that the warranty lasts for one year from the retail purchase of the television. Not only did Mr. Johnson fail to contact MDEA about the television's alleged shortcomings within a year of his purchase, he decided not to contact MDEA about the warranty at all. The only contact Mr. Johnson has had with MDEA with regard to his television's performance is through the present lawsuit.

> creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Cal. Com. Code § 2313.  Mr. Johnson argues that MDEA expressly warranted that the television's HDMI input ports would be capable of receiving a native 1080p signal and displaying it on the television's screen.  (Pl.'s Brf. at 22.)  According to Mr. Johnson, MDEA allegedly warranted the television's ability to do this in two ways: (1) by labeling the television as a 1080p television set in promotional materials, packaging, and on its Web site, in concert with its adoption of national standards defining a 1080p signal; and (2) by issuing a news release claiming that the television was poised to take advantage of new entertainment technologies, including high-definition Blu-ray and DVD players, and gaming consoles like the Sony Playstation 3.  To create a warranty, a seller must make a factual representation.  Contrary to Mr. Johnson's assertion, MDEA did not make representations or promises with sufficient specificity for a reasonable purchaser to believe that the television was capable of receiving a native 1080p signal through its HDMI input ports.

### a) MDEA's Designation of the Television as "1080p"

Mr. Johnson alleges that MDEA's designation of the television set as a 1080p television set was a warranty that its HDMI input ports could accept native 1080p signals for display. He asserts that MDEA made this promise both on its Web site and in the television's packaging and promotional materials. Mr. Johnson argues that this 1080p designation, when read in concert with the Advanced Television Systems Committee ("ATSC") Standard, confirms that MDEA could only have been referring to the types of signals that the television was capable of receiving when it designated the television 1080p. (Decl. of Randall Hoffner ("Hoffner Decl.") ¶ 13.)

The ATSC Standard was created to govern what kind of signals broadcasters and other content producers should create to be sent to state-of-the-art digital televisions as the United States television system converted from an analog to a digital system. (Hoffner Decl. Ex. 2.) It defines each kind of signal in terms of what resolution picture each signal is capable of carrying. (Hoffner Decl. Ex. 3, ATSC Digital Television Standard at 23, ("ATSC Standard") ¶ 1.1.) The ATSC Standard's definition of its scope makes clear that it is meant to govern the kinds of signals produced, not to the input capabilities of consumer televisions. The ATSC Standard describes its scope as governing how broadcasters and other content producers are supposed to change their products, such as films, television programs and video games, into coded digital signals that can be decoded by consumers' televisions. (ATSC Standard at 1, ¶ 1.1.) The ATSC Standard's scope specifically refers to a device called a video encoder, which can take a stream of pictures or sounds and convert it to a digital signal (a bit stream) that can be sent to televisions. (ATSC Standard at 29.) The purpose of the ATSC Standard, then, is to standardize the format of encoded video signals so that electronics manufacturers can make compatible televisions and have a smooth transition to a digital television system. (Hoffner Decl. Ex. 2.) The ATSC

Standard does not proscribe the inputs that manufacturers are supposed to put on their television sets; for instance, its definitions do not mention HDMI at all.

The ATSC Standard does not define 1080p; rather, it uses the term 1080p, which refers to the resolution of a video on the screen, to define one type of digital signal. Although the ATSC Standard uses the term 1080p to define one kind of signal to be sent by content producers, it does not define the term 1080p with regard to television inputs or resolutions. The subject matter addressed by the ATSC Standard is far too attenuated from the capabilities of individual televisions to be an actionable definition of 1080p for the purposes of a breach of warranty claim as applied to purchasers of individual televisions. The ATSC Standard's intended audience is engineering professionals, not consumers; and the ATSC Standard is not written in such a manner as to be accessible to consumers. It simply is not credible for Mr. Johnson to claim that the ATSC Standard creates a definition of the term 1080p—and by extension a warranty—that is supposed to be relied upon by consumers.

Mr. Johnson points to *Lane v. C.A. Swanson & Sons*, 130 Cal. App. 2d 210 (Cal. App. Ct. 1955), among other cases, to illustrate how MDEA's designation of the television as 1080p created a warranty that it has now breached. In *Swanson*, the court held that the Swanson food company warranted a can of chicken as free of bones when it labeled the can "Boned Chicken" and advertised it as having "No Bones." *Swanson*, 130 Cal. App. 2d at 212. Swanson breached the warranty when it included a bone in the can, upon which the plaintiff choked. To support its decision, the court stated that Swanson's statements left no doubt about the chicken's boneless nature: "If there could be any doubt as to the meaning of "boned chicken," it was removed by the statement that it contained no bones." *Swanson*, 130 Cal. App. 2d at 216. Thus, the court believed it was important that the purported warranty made by the manufacturer actually contain information that was understandable by the targeted consumer.

Unlike the phrase at issue in *Swanson*, the abstract designation 1080p does not convey a specific claim that is recognizable to the targeted consumer.  It can be used to describe the density and scanning rate of the picture displayed on a television, the characteristics of a bit stream encoded by broadcasters or content producers to be burned onto a digital videodisc, or the signal being sent from a video game console or computer to a television monitor.  The term is capable of carrying a multiplicity of meanings or no meaning at all.  Indeed, while Mr. Johnson has shopped for, purchased, owned, or litigated over a high-definition television set for nearly three years, he still cannot offer a coherent definition of the meaning of 1080p or articulate how his television set deviates from that definition:

> Q: You're not entirely sure what 1080p is, are you?
>
> A: I know that 1080p was pushed as being the best screen, or whatever, the best you could watch.  I bought the TV based on that presumption that was—you know, and I have never received a 1080p reception or I've never seen a "1080p."

(Johnson Transcript at 76-77.)  The phrase 1080p does not carry a specific meaning for a reasonable consumer or for Mr. Johnson.  Put simply, "1080p" is not "boned chicken."   It merely seems to mean, as Mr. Johnson states, "the best screen."  (*Id.*)

### b)  MDEA's June 27, 2005 Press Release

Mr. Johnson also asserts that MDEA created a warranty through claims made in a news release touting its new televisions' capabilities with exuberant language.  On June 27, 2005, MDEA issued a press release announcing a new line of "1080p DLP High Definition Televisions."  (Release.)  The release touted the television's general picture quality, resolution, clarity, brightness, and depth.  It also predicted that there would be new sources of 1080 content available in the future, including content from

Blu-ray and HD DVD players, and personal computers. Broadcast and cable companies would soon transmit their programming in 1080p, the release predicted. The new line of televisions, one of which Johnson purchased, "will be poised to take full advantage of the latest HD content and deliver it with unsurpassed picture quality." (Release.) However, nearly three years later, no broadcast or cable outlet makes 1080p programming available. And Mr. Johnson's television is incapable of receiving 1080p content from other devices, such as Blu-ray players or state-of-the-art gaming consoles. Instead, Mr. Johnson's television receives the content in 1080i or 720p and converts it to a 1080p picture.

Mr. Johnson argues that the news release—which Mr. Johnson did not read prior to his purchase of the television—warranted that the television would be able to receive native 1080p signals for display. However, the words purportedly making this warranty, promising that the television would "take full advantage" of new technology and provide "unsurpassed picture quality," are merely sales puffery. If a statement is mere sales puffery stating an opinion of a product's superiority, it does not contain a statement of fact that is actionable. *See Haute v. Zogarts*, 14 Cal. 3d 104, 11 (Cal. App. Ct. 1975) ("If defendants' assertion of safety is merely a statement of opinion—mere "puffing"—they cannot be held liable for its falsity."). *See also Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351 (holding that a satellite broadcaster's assertions of "crystal-clear digital" video quality and "CD-quality" sound were "not factual representations that a given standard is met" but "boasts, all-but-meaningless superlatives.").

The claims made by Mr. Johnson in this case are similarly devoid of meaning. Mr. Johnson argues that the phrase "poised to take full advantage" of new technologies is a warranty that the television could specifically accept 1080p signals from future devices. However, the statement's characterization of those sources as "new"

disclaims any warranty that might be created. If the technologies were new, predicted to be available in the months and years after the television's release, then there was a distinct possibility that they would evolve in ways that were not compatible with the television. It is also clear that the promise to deliver unsurpassed picture quality is merely an opinion that MDEA's television picture looks the best. One would be hard pressed to say that this is anything more than a self-serving superlative.

### B. FRAUDULENT CONCEALMENT

Mr. Johnson argues that Mitsubishi fraudulently concealed the fact that the television could not process a 1080p signal through its HDMI input port, causing him to purchase the television, or at least pay too much money for it. The elements of fraud or deceit based upon concealment are:

> (1) the defendant must have concealed or suppressed a material fact;
>
> (2) the defendant must have been under a duty to disclose the fact to the plaintiff;
>
> (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff;
>
> (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and
>
> (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Marketing West Inc. v. Sanyo Fisher Corp.*, 6 Cal App. 4th 603, 612-13 (Cal. App. Ct. 1992). Courts have allowed fraudulent concealment claims in cases where it can be shown that the defendant affirmatively acts to conceal information that was not readily available. *See Shapiro v. Sutherland*, 64 Cal. App. 4th 1534 (Cal. App. Ct. 1998)

("Generally, where one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known or reasonably discoverable by the other party, then a duty to disclose exists."). In *Shapiro*, a party selling a home was liable for material nondisclosure after it failed to disclose that it was plagued by problems from noisy and rowdy neighbors. In that case, the seller was asked on a form whether there were noise problems and did not make the disclosure. The court also noted that it would not have been possible for the purchasers to discover the noisy neighbors with reasonable efforts. *See also Vega v. Jones Day, Reavis & Pogue*, 121 Cal. App. 282 (Cal. App. Ct. 2004) (holding that a law firm's failure to disclose toxic assets to a buyer of a corporation, when the firm was in a markedly better position than the buyer to know that information, was an actionable case of fraudulent concealment). In *Vega*, the law firm also submitted a sanitized version of the written disclosure statements it prepared as counsel to one of the parties in the transaction. *Id.* at 290. However, when it cannot be shown that defendants acted to conceal information, courts have not found that fraudulent concealment occurred. *See Clayton v. Landsing Pac. Fund Inc.*, 2002 WL 1058247 (N.D. Cal. 2002) (holding that a fraudulent concealment claim did not exist where the material information was publicly available where a prudent investor would have noticed it).

In this case, MDEA did not conceal material information from Mr. Johnson; MDEA made it all public. Specifically, MDEA did not conceal the television's input capabilities—it made that information readily available in the television's owner's manual, which was available to the public on the Internet. (Yamashita Decl. ¶ 11, 16.) The owner's manual offers extensive explanations of the types of signals that can be processed through the television's inputs. (Purcell Decl. Ex. A, at 94, 107.) Although the manual does not explicitly state that the television can receive a native 1080p signal, it does identify the specific signals that can be processed through its HDMI input ports. The manual explicitly states that the HDMI input ports can process 480i,

480p, 720p, and 1080i signals. (*Id*. at 107.) Admittedly, this is not an affirmative disclosure that the television cannot process 1080p signals through its HDMI input ports. However, the omission of the 1080p signal from this exhaustive list is as good as an affirmative disclosure that its HDMI input ports cannot process a 1080p signal. To borrow from the canons of statutory construction, *expressio unius est exclusio alterius*: the expression of the possible signals in this case implies the exclusion of others, namely, the 1080p signal. To argue otherwise would require manufacturers to not only honestly tout their products' features and capabilities, but also to disclose all of the features their products lack. It is simply not realistic to expect manufacturers to make such an immense, and, perhaps, boundless disclosure.

Moreover, Mr. Johnson has not shown that he would have acted any differently had MDEA explicitly told him that the HDMI input ports on his television could not accept native 1080p signals. Mr. Johnson admits that he did not search for information about the television and was not exposed to any MDEA marketing materials prior to his purchase of the television. The truth of the matter is that Mr. Johnson did not care about whether the HDMI input ports on his television could accept 1080p signals. He wanted the television primarily so he could watch sports programming and Home and Garden Television from his cable provider, but no television content from cable or broadcast providers is transmitted in 1080p. Indeed, Mr. Johnson got the "best 1080p television" available, exactly what he sought to purchase. (Johnson Transcript at 38.) Questioned nearly three years after his purchase, he admits that it is a great television; that he knew of no better available at the time. (Johnson Transcript at 60, 65, 113.) Mr. Johnson said he wanted the best, and the uncontroverted record before the Court indicates that he got exactly what he wanted.

## C. California Business and Professions Code § 17200

Mr. Johnson is also alleging that MDEA violated California Business and Professions Code § 17200 by selling him a television that was labeled 1080p that is incapable of receiving a native 1080p signal from available sources through its HDMI input ports. This claim fares no better than Mr. Johnson's warranty and fraudulent concealment claims. Section 17200 requires that the plaintiff show that the defendant has engaged in "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Com. Code § 17200. No such business practice or advertising occurred here.

*Consumer Advocates,* a case dealing with a satellite television provider's advertising, is particularly on point. In that case, a satellite television provider claimed that it transmitted digital video signals when, in fact, some of the signals it transmitted were originally analog signals converted to digital signals. *Consumer Advocates*, 113 Cal. App. 4th at 1355. The company also advertised that it provided crystal-clear video and CD-quality audio when the system was prone to blackouts and pixilation. *Consumer Advocates*, 113 Cal. App. 4th at 1355-56. Concluding that the company committed no violation under § 17200, the court stated:

> "Crystal clear" and "CD quality" are not factual representations that a given standard is met. Instead, they are boasts, all-but-meaningless superlatives, similar to the claim that defendants "love comparison[s]," a claim which no reasonable consumer would take as anything more weighty than an advertising slogan. After all, how clear is any given crystal? [H]ow good are the speakers on the CD player? The common experience of television watchers since the beginning of television is that no television delivery system is perfect. Broadcast is subject to interference and reception problems. Cable goes out, usually at inconvenient times. Satellite systems, as plaintiffs have demonstrated, have their own problems.

*Consumer Advocates*, 113 Cal. App. 4th at 1361. Here too, Mr. Johnson has failed to show a genuine issue of material fact as to whether MDEA did anything unlawful, unfair, or fraudulent. More specifically, Mr. Johnson has failed to establish that MDEA warranted or misrepresented to him that the HDMI input ports on his television could accept native 1080p signals. Neither the 1080p label nor MDEA's news release can be reasonably understood as promising such a capability. Certainly, the news release and the 1080p designation contained less factual representations than the claims made in *Consumer Advocates*. Accordingly, Mr. Johnson's claim for violations of § 17200 fails as a matter of law.[3]

### D. UNJUST ENRICHMENT

Mr. Johnson is also alleging that MDEA was unjustly enriched by his purchase of the television. Unjust enrichment requires that one party receive a benefit unjustly at the expense of another. It not only requires that a benefit be conferred, but that it is unjust for the defendant to retain that benefit. *First Nat. Sav. Bank v. Perry*, 11 Cal. App. 4th 1657, 1663 (Cal. App. Ct. 1992). In this case, Mr. Johnson neither sought out, nor was exposed to MDEA marketing materials prior to his purchase of the television. And as discussed above, Mr. Johnson has not shown that MDEA warranted or misrepresented that the television was capable of receiving native 1080p signals through its HDMI input ports, nor has he shown that MDEA fraudulently concealed the television's lack of this capability. Therefore, even if money from Mr. Johnson's television purchase flowed directly to MDEA through the stream of commerce, MDEA did not receive that money unjustly. Mr. Johnson got the television he wanted.

---

[3] It is also doubtful that Mr. Johnson has standing to sue under § 17200. California Business and Professions Code § 17204 requires that a plaintiff show an injury in fact and a loss of money or property from the defendant's unfair competition. Since Mr. Johnson has not established that his decision to purchase the television was affected directly by MDEA's actions, he could not have suffered the injury needed to have standing to sue under § 17200.

## V. CONCLUSION

For the foregoing reasons, MDEA's motion for summary judgment on all claims by Mr. Johnson is GRANTED.

DATED: September 24, 2008

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE